UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

|  |  |
|---|---|
| ASSEMBLYMAN JAKE BLUMENCRANZ, in his official capacity as Member of the New York State Assembly representing the 15th Assembly District, | Case No. |
|  | **COMPLAINT** |

Plaintiff,

-against-

GOVERNOR KATHY HOCHUL, in her official capacity as Governor of the State of New York, METROPOLITAN TRANSPORTATION AUTHORITY, and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

Defendants.

-----------------------------------------------------------------x

Plaintiff Assemblyman Jake Blumencranz files this Complaint against Defendants Governor Kathy Hochul, the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), and alleges as follows:

## **INTRODUCTION**

1. In April 2019, the New York State Legislature passed the Traffic Mobility Act ("TMA") with the approval of then-Governor Andrew Cuomo.  See Chapter 59, Laws of 2019 of New York State.

2. The TMA was nothing more than a legislative mandate to fleece drivers, disguised as a solution to a problem exacerbated by the State's own incompetence.  On paper, the goal of the legislation was to reduce traffic congestion in Manhattan's Central Business

District ("CBD") and creating a funding source for the MTA's capital needs.  <u>See</u> N.Y. Veh. & Traf. Law § 1701 et seq.

3.  The TMA authorized and directed TBTA, the MTA's independent affiliate, to establish and operate a congestion pricing program, including tolling of eligible vehicles entering or remaining in the CBD, and earmarked the revenues from the Program for the MTA's 2020-2024 Capital Program and subsequent capital programs.

4.  Upon information and belief, on or around June 2019, the New York State Department of Transportation ("NYSDOT"), TBTA, and the New York City Department of Transportation ("NYCDOT"), formally sought authority to assess tolls on vehicles entering the CBD under the federal Value Pricing Pilot Program ("VPPP").

5.  The VPPP is a program created by Congress, under which FHWA may authorize tolling of federal aid highways to reduce roadway congestion and improve air quality, including through congestion pricing strategies.

6.  Currently, the VPPP program includes a variety of strategies to manage congestion on highways and surface streets, including strategies not involving tolls, such as priced lanes; priced highways; priced road networks; priced zones ("area or cordon pricing"); and road usage pricing without tolls.

7.  As proposed, the CBD congestion pricing program at issue is the nation's first congestion pricing program of its kind and uses a cordon pricing strategy, which charges drivers entering Manhattan south of 60th Street with a toll, leaving affected drivers with an ability to drive to this area without paying said toll.

8.  Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., FHWA was required to evaluate the potential environmental effects of the CBD congestion pricing program.

9.  On November 21, 2024, FHWA executed the VPPP Agreement with the NYSDOT, TBTA, and NYCDOT, which authorized the Program's collection of tolls.

10. On January 5, 2025, New York State officially implemented congestion pricing, charging drivers a new toll to enter Manhattan's Central Business District ("CBD").

11. The program, designed and enforced by the MTA and the NYSDOT, was intended to curb traffic congestion and raise revenue for the City's mass transit system. However, its rollout has been anything but smooth.

12. For months, opposition to the tolling program had been mounting. Commuters from Long Island, the outer boroughs, and neighboring states braced for yet another financial burden in a city that had already become prohibitively expensive.

13. Small business owners worried about rising costs, emergency service providers questioned response times, and working families saw yet another policy that made it harder—not easier—to make a living in New York.

14. Elected officials from across the region voiced concerns, including Plaintiff Assemblyman Jake Blumencranz, warning that the program would unfairly punish suburban commuters and disproportionately impact middle-class workers who have no alternative but to drive into the city.

15. On November 5, 2024, President Donald J. Trump was elected President of the United States for a term that commenced on January 20, 2025.

16. Shortly thereafter, on February 19, 2025, in a stunning reversal, the United States Secretary of Transportation, Sean P. Duffy, formally revoked federal approval for congestion pricing, confirming that in the absence of said approval, the program could not legally proceed.  See Exhibit A, Letter dated February 19, 2025 from Secretary of the United States Department of Transportation Sean P. Duffy addressed to Governor Kathy Hochul.

17. The decision should have brought the tolling scheme to a halt.  Instead, the MTA pressed forward, ignoring federal intervention and forging ahead with congestion pricing as if nothing had changed, and even pursued legal recourse with the endorsement and cooperation of Defendant Governor Kathy Hochul.

18. For Plaintiff Assemblyman Jake Blumencranz, a Member of the New York State Assembly representing the 15th Assembly District, the program's reckless implementation was the final straw.  For years, he had warned of the MTA's fiscal mismanagement, lack of transparency, and refusal to consider alternative solutions.  He had introduced legislation, Assembly Bill A.6906 (Blumencranz), to repeal congestion pricing and require a forensic audit of the MTA's finances.  But his concerns—like those of so many other commuters and policymakers—were dismissed.  See Exhibit B, Assembly Bill A.6906 (Blumencranz).

19. Now, with the program in full effect and the tolls being collected in defiance of federal authority, the stakes are higher than ever.  The congestion pricing plan is no longer just a matter of policy—it has become a question of legality.  Can the MTA impose tolls when the federal government has explicitly withdrawn its approval?  Can New York State unilaterally enact a policy that disproportionately harms suburban and out-of-state

commuters?   And, perhaps most urgently, what does this mean for the thousands of drivers who are now being forced to pay an unapproved toll every single day?

20. These are the questions at the heart of this legal action.   Plaintiff Assemblyman Jake Blumencranz, both as an elected official and as a commuter personally impacted by this policy, is seeking answers—and accountability.

21. The MTA's implementation of congestion pricing on January 5, 2025, was unlawful from the outset, and even more so now, as federal law prohibits states from imposing tolls on federally funded highways without explicit approval from the FHWA under 23 U.S.C. § 301.

22. The FHWA initially granted conditional approval on June 26, 2023, but the United States Secretary of Transportation later revoked this approval, rendering the program legally null.

23. The failure to conduct a full Environmental Impact Statement (EIS) violated federal law, as congestion pricing has wide-ranging economic and environmental consequences that were not properly assessed.

24. The tolling scheme results in double taxation for many commuters, particularly those who already pay bridge and tunnel tolls before entering the congestion pricing zone.

25. The promised exemptions for emergency vehicles, essential workers, and other critical sectors were either insufficient or inconsistently applied, further undermining the rationale behind the program.

26. Despite claiming that congestion pricing would reduce traffic congestion, the MTA's own traffic models suggest only marginal improvements, further calling into question the legitimacy of the program's stated purpose.

27. Congestion pricing places an undue financial burden on small businesses, independent contractors, and delivery services, raising the cost of living and consumer goods throughout the region.

28. United States Secretary of Transportation Sean P. Duffy and other federal officials have raised substantive legal and economic concerns about congestion pricing, further demonstrating the lack of national consensus on the program's legality and effectiveness.

29. The MTA's repeated fare hikes, budget deficits, and fiscal mismanagement illustrate the urgent need for independent oversight and a forensic audit, as proposed in Assembly Bill A.6906 (Blumencranz).

30. New Jersey officials have strongly opposed congestion pricing, citing its disproportionate impact on out-of-state commuters and the absence of reciprocal revenue-sharing mechanisms.

31. This action seeks an immediate injunction against future toll collections.

32. The legal foundation of this lawsuit is clear: congestion pricing is preempted by federal law, implemented in defiance of the United States Secretary of Transportation, and constitutes an unconstitutional burden on New Yorkers.

33. This legal action seeks to invalidate and enjoin the enforcement of congestion pricing on a number of grounds.

34. First, the congestion pricing program amounts to a violation of the Supremacy Clause (*U.S. Const. Art. VI, Cl. 2*) – New York's continued enforcement of congestion pricing directly contravenes federal law, as the United States Secretary of Transportation has formally revoked federal approval, rendering the program unlawful under 23 U.S.C. § 301.

35. Second, the congestion pricing program amounts to a violation of the New York State Administrative Procedure Act (SAPA) – The MTA and NYSDOT's decision to continue implementing congestion pricing despite the Secretary's revocation of federal approval constitutes agency action that is arbitrary, capricious, and contrary to law.

36. Third, the congestion pricing program amounts to a violation of 42 U.S.C. § 1983 – Deprivation of Constitutional and Federal Rights Under Color of State Law – By enforcing an illegal tolling scheme without valid federal authorization, the MTA and NYSDOT have deprived Plaintiff Assemblyman Jake Blumencranz, and all New Yorkers affected by the program of their federal rights and subjected them to an unconstitutional and unlawful tax.

37. Accordingly, Plaintiff Assemblyman Jake Blumencranz respectfully requests a Declaratory Judgment and Injunctive Relief seeking a judicial determination that congestion pricing is void and unenforceable and requesting an immediate injunction prohibiting the MTA and NYSDOT from collecting further tolls.

38. Plaintiff Assemblyman Jake Blumencranz further seeks a court order compelling the MTA and NYSDOT to cease enforcement and comply with the Secretary's decision.

39. For the reasons outlined above, this lawsuit seeks immediate relief, including: (1) a declaratory judgment that congestion pricing is invalid and unenforceable; (2) an injunction preventing further toll collections; and any and all such relief compelling compliance with federal law.

**PARTIES, JURISDICTION, AND VENUE**

40. Plaintiff Assemblyman Jake Blumencranz is a duly elected Member of the New York State Assembly who represents the 15th Assembly District which covers portions of Nassau County on Long Island. In addition to numerous other committees, he serves as a Member of the Assembly Committee on Corporations, Authorities, and Commissions which oversees laws and statutes concerning private, not-for-profit, and public corporations in New York State, particularly the MTA and the TBTA.

41. Defendant MTA is a public benefit corporation organized under the laws of New York, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut. The MTA has offices in New York, New York, and is governed by a 23-member board which is coterminous with the board of TBTA.

42. Defendant TBTA is an affiliate of the MTA. It is a public benefit corporation organized under the laws of New York, with offices in New York, New York. TBTA is a signatory to the Value Pricing Pilot Program (VPPP) Agreement and is responsible under New York law for the implementation and operation of the Program.

43. This Court has subject matter jurisdiction over this action pursuant to 23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the United States Constitution. This Court has remedial authority including pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and Rule 57 of the Federal Rules of Civil Procedure.

44. Venue is proper in this district under 28 U.S.C. § 1391(e) because the MTA and TBTA are headquartered in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

45. For decades, the New York metropolitan area has suffered from traffic congestion. However, the solutions proposed by Albany elites have consistently ignored the real problems and instead sought to extract more money from hardworking New Yorkers.

46. The notion that congestion is a primary cause of public health issues is a thinly veiled attempt to justify a tax grab. While emissions are a concern, the real issue is the State's mismanagement of transportation infrastructure, not the mere presence of vehicles on the road.

47. The claim that congestion "erodes worker productivity" is a typical bureaucratic excuse. The real erosion of productivity comes from the endless red tape and anti-business policies emanating from Albany.

48. The New York State Legislature, in its infinite wisdom, decided to resurrect the failed concept of congestion pricing, a scheme first proposed by academics who clearly never had to navigate the realities of New York City traffic.

49. The idea that congestion pricing would magically solve all of New York City's problems is ludicrous.

50. The TMA's assertion that traffic in New York "ranks second worst among cities in the United States and third worst among cities in the world" is a gross exaggeration, designed to instill fear and justify this outrageous toll.

51. The Legislature's claims about the "underfunding" of the subway system are a blatant lie. Decades of mismanagement and wasteful spending have led to the current state of affairs, not a lack of revenue.

52. The notion that congestion pricing is a "matter of substantial state concern" is an insult to the intelligence of New Yorkers. This is a matter of substantial state greed.

53. The TMA's authorization of the TBTA to "establish and charge variable tolls" is a clear overreach of state power, a direct attack on the wallets of everyday citizens.

54. The fact that federal approval was needed for this program shows how invasive and damaging it is. Without the Federal Highway Administration (FHWA) approval, the State knew it could not legally steal from the citizens.

55. The VPPP, a program intended to allow for pilot projects, was twisted and manipulated to allow this program to move forward.

56. The FHWA's claim that the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced" is a farce. They knew this program would do nothing but steal money.

57. The suggestion that congestion pricing "shifts some rush hour highway travel to other transportation modes" ignores the reality that many New Yorkers have no alternative to driving.

58. The environmental review process under NEPA was a sham. The Draft Environmental Assessment (EA) and Final EA were nothing more than bureaucratic exercises designed to rubber-stamp the State's agenda.

59. The public hearings and comment periods were a waste of time. The State had already made up its mind, and the voices of ordinary citizens were ignored.

60. The claim that the program would not have adverse effects on air quality is laughable. The reality is that this toll will simply divert traffic to other areas, shifting pollution rather than reducing it.

61. The MTA's $155 million "mitigation package" is a drop in the bucket compared to the billions that will be extracted from drivers.

62. The Final EA's prediction of "beneficial environmental effects" is nothing more than wishful thinking.  The only real effect will be a decrease in the quality of life for New Yorkers.

63. The FHWA's approval of the Final EA and Finding of No Significant Impact (FONSI) was a betrayal of the public trust.

64. The TBTA's approval of the toll rate schedule was a slap in the face to hardworking New Yorkers.

65. The reevaluations under NEPA were a mere formality, designed to justify the state's predetermined course of action.

66. However, with the Trump administration, and Secretary Duffy at the head, the Federal Government finally stepped in to stop this madness.

67. The VPPP Agreement, signed by the FHWA and the NYSDOT, TBTA, and NYCDOT, was a deeply flawed document that should never have been approved in the first place.

68. The agreement's lack of a provision for FHWA to terminate the agreement was a critical oversight, one that thankfully, Secretary Duffy corrected.

69. The claim that the MTA "budgeted over $500 million" for the program is a testament to their wasteful spending.  This money could have been used to address the real problems facing our transportation system.

70. Defendant Governor Kathy Hochul's initial "temporary pause" was a cynical ploy to deflect public anger.  Her subsequent attempt to revive the program with a "phase-in approach" only demonstrates her contempt for the people of New York.

71. Defendants MTA and Governor Kathy Hochul continuously parade a series of dismissed legal challenges as proof of their program's righteousness.  However, these dismissals often hinge on procedural technicalities and premature filings, not the actual merits of the case.  The courts' refusal to grant preliminary injunctions does not equate to an endorsement of the program's legality or its long-term viability.

72. The claim that the courts have "largely dismissed" concerns about the program's environmental impact is a gross mischaracterization.  While some specific claims may have been dismissed, significant issues remain regarding the program's potential to disproportionately harm environmental justice communities.  These concerns cannot be simply brushed aside.

73. The program's "launch" was nothing more than the activation of a system to unlawfully extract tolls from drivers.  Its mere existence does not validate its legality or its ethical implications.

74. The "promising outcomes" touted by the MTA are based on cherry-picked data and premature assessments.  It is far too early to declare the program a success, and any purported benefits must be weighed against the very real economic burdens it imposes on New Yorkers.

75. The reported improvements in travel times at key crossings are anecdotal and lack rigorous scientific backing.  Moreover, they ignore the potential for traffic diversion and increased congestion in other areas.

76. The MTA's data on reduced vehicle presence in the CBD may be accurate, but it does not tell the whole story.  We must consider the program's impact on businesses, residents, and the overall economic health of the city.

77. The claim that the program has not hindered economic activity is unsubstantiated.  The reported increases in Business Improvement District visits and Broadway revenues could be attributed to various factors, and a more comprehensive analysis is needed.

78. The "positive shift in commuter behavior" touted by the MTA is a forced shift, not a genuine change in preference.  New Yorkers are being coerced into using public transit due to the financial burden of the tolls, not because of any inherent improvement in the system.

79. Any purported benefits of the program, such as improved subway commute times and decreased crime rates, are purely coincidental.  The program is not designed to address these issues, and any claims of causality are dubious at best.

80. The "marked decrease in subway crime" is a misleading statistic.  Crime rates fluctuate for various reasons, and attributing any decrease solely to the congestion pricing program is intellectually dishonest.

81. Public sentiment, as reflected in polls and statements from elected officials, is not a reliable indicator of a program's merit.  Polls can be easily manipulated, and politicians often prioritize their own interests over those of their constituents.

82. The "positive feedback" from New Yorkers regarding street safety and pedestrian experience is anecdotal and subjective.  Many New Yorkers, particularly those who rely on driving for their livelihoods, have expressed strong opposition to the program.

83. Social media is not a reliable gauge of public opinion. The "outpouring of support" for the program on these platforms could be the result of astroturfing or other forms of manipulation.

84. The "notable increase in subway ridership" is a direct consequence of the program's financial coercion, not an organic shift in commuter behavior.

85. The support for the program from transit advocacy groups and environmental organizations is often based on ideological biases, not sound economic or scientific reasoning.

86. The backing of the program by business leaders and urban planning experts is often driven by self-interest and a desire to maintain the status quo, not a genuine concern for the well-being of New Yorkers.

87. The program's potential to generate "substantial revenue" is undeniable. However, this revenue comes at the expense of hardworking New Yorkers, and there is no guarantee that it will be used wisely or effectively.

88. The "decrease in traffic violations and accidents" is a premature and unsubstantiated claim. Traffic patterns are complex, and it is too early to draw any definitive conclusions about the program's impact on road safety.

89. The shift towards alternative modes of transportation is a forced adaptation, not a voluntary choice. New Yorkers are being compelled to change their habits due to the financial burden of the tolls, not because of any genuine improvement in the transportation landscape.

90. The infrastructure improvements touted by the MTA are long overdue and should not be used to justify the implementation of an unjust and illegal tolling program.

91. The notion that the program has fostered a "sense of community and civic pride" is laughable.  It has instead created division and resentment among New Yorkers, pitting those who can afford the tolls against those who cannot.

92. The actions of the Trump administration, and Secretary Duffy, to revoke the approval of this program are a breath of fresh air for New Yorkers.  Finally, we have leaders who are willing to stand up to the Albany establishment and protect the interests of the people.

93. The congestion pricing program is a perfect example of government overreach and bureaucratic incompetence.  It is a tax on the middle class, a burden on small businesses, and a betrayal of the American way.

94. Plaintiff Assemblyman Jake Blumencranz was personally charged the congestion pricing toll on Sunday, February 23, 2025—days after United States Secretary of Transportation Sean P. Duffy formally revoked federal approval.

95. This unlawful charge is not just an inconvenience but a flagrant defiance of federal authority, demonstrating that the MTA and NYSDOT are acting without regard for the rule of law.

96. On the very day that Plaintiff Assemblyman Jake Blumencranz traveled to Central Park to commemorate the 500th day since the October 7th Hamas attacks—an event honoring victims—he was forced to pay an illegal toll.  This was not merely a routine drive, but a journey of solemn remembrance, support, and community solidarity, tainted by an unjustified financial burden.

97. Long Islanders, already overtaxed and underserved by the MTA, now bear a disproportionate share of congestion pricing's cost.  The program punishes suburban

commuters who have no viable alternative to driving, treating them as a cash reserve to fill the MTA's financial gaps while failing to deliver improved transit services in return.

98. The congestion pricing scheme is a deliberate and unjust policy that disproportionately burdens Long Islanders, Staten Islanders, and New Jersey residents, while leaving politically favored constituencies largely untouched. Why should residents of Nassau and Suffolk counties be forced to fund a transit system that has neglected their communities for decades?

99. The concerns of Long Island commuters were dismissed outright in the lead-up to congestion pricing's implementation. No meaningful exemptions or mitigations were granted to suburban workers, medical patients, or emergency responders, further proving that this policy was designed without regard for the realities of those living outside the five boroughs.

100.    While Long Islanders are forced to pay this unjust fee, the MTA has provided no transparency, no financial accountability, and no clear plan for improving transit access to suburban communities.

101.    The agency's long history of waste, fraud, and mismanagement raises serious doubts about whether any of the revenue from congestion pricing will actually lead to the infrastructure improvements it promises.

102.    Finally, despite the revocation of federal approval for the congestion pricing program, on February 19, 2025, Defendant Governor Kathy Hochul defiantly proclaimed that the cameras would stay on and tolls would remain in effect, in direct contravention of federal authority.

103.    Days later, Defendant Governor Kathy Hochul doubled down on her defiance on February 26, 2025 at an MTA Board Meeting pledged to engage in "orderly resistance" in defiance of the federal revocation of approval for the congestion pricing program.

104.    Accordingly, this lawsuit is a necessary step to protect the rights of New Yorkers and to ensure that this illegal and unjust toll is never implemented.

**CAUSES OF ACTION**

**COUNT 1**

**THE CONGESTION PRICING PROGRAM IS PREEMPTED BY FEDERAL LAW AND VIOLATES THE SUPREMACY CLAUSE (U.S. CONST. ART. VI, CL. 2)**

105.    Plaintiff Assemblyman Jake Blumencranz realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

106.    The Supremacy Clause of the United States Constitution mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." See U.S. Const. Art. VI, Cl. 2.

107.    The doctrine of federal preemption derives from this principle and invalidates any state law that conflicts with federal law.

108.    The Supreme Court has repeatedly affirmed that where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it must yield to federal law. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73 (2000).

109.     In this case, the federal statutory scheme governing highways and tolling explicitly restricts a state's ability to impose tolls on federally funded roads absent federal authorization.

110.     Under 23 U.S.C. § 301, all highways constructed or maintained with federal funds must be free from tolls unless Congress has provided an explicit exception.  <u>See</u> 23 U.S.C. § 129(a).  The statute further mandates that tolling may be permitted only in narrow circumstances and only with express authorization from the FHWA or the United States Secretary of Transportation.  <u>Id.</u>

111.     The congestion pricing program at issue applies to roads that have received substantial federal funding, making it subject to these federal restrictions.

112.     Critically, the United States Secretary of Transportation formally revoked prior approval for New York City's congestion pricing program.

113.     This revocation constitutes a clear federal determination that the MTA and NYSDOT may no longer collect tolls under the program.

114.     Once federal approval has been rescinded, any attempt by the State to continue enforcing congestion pricing amounts to a direct violation of federal law.

115.     The Supreme Court has recognized that conflict preemption applies when a state regulation "interferes with the methods by which the federal statute was designed to reach its goal."  <u>See</u> <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 103 (1992).

116.     The ongoing enforcement of congestion pricing, despite the revocation of federal approval, obstructs federal transportation policy and creates an impermissible conflict with federal law.

117.     Because New York's congestion pricing program directly contradicts a federal determination and operates in defiance of express statutory provisions, it is unconstitutional under the Supremacy Clause.

## COUNT 2

### DEFENDANTS' MTA AND TBTA'S CONTINUED ENFORCEMENT OF CONGESTION PRICING VIOLATES THE NEW YORK STATE ADMINISTRATIVE PROCEDURE ACT (SAPA)

118.     Plaintiff Assemblyman Jake Blumencranz realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

119.     Under the New York State Administrative Procedure Act (SAPA), state agencies may not adopt or implement policies that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  See SAPA § 202(1), § 205.

120.     SAPA further prohibits agencies from acting outside the scope of their statutory jurisdiction and requires courts to set aside actions that exceed an agency's lawful authority.  See SAPA § 205.

121.     It is well established that a federal court may exercise jurisdiction over state law claims, including those brought under SAPA, when they are supplemental to federal claims that provide a basis for jurisdiction.  See 28 U.S.C. 1367(a); see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004).

122.     Because Plaintiff Assemblyman Jake Blumencranz's SAPA claim derives from the same nucleus of operative facts as his federal claims, the court may properly exercise supplemental jurisdiction over it.

123.    Defendants MTA and TBTA, despite the federal government's revocation of congestion pricing approval, have continued to collect congestion pricing tolls without lawful authority.

124.    The MTA and TBTA's enforcement of congestion pricing following the Secretary of Transportation's explicit revocation of federal approval constitutes arbitrary and capricious agency action in violation of SAPA.

125.    Under SAPA, agency actions must be properly authorized by law and comply with procedural requirements.  The continued enforcement of congestion pricing lacks such legal authority following federal revocation, rendering the policy unlawful.

126.    The MTA and TBTA's refusal to cease collection of congestion pricing tolls in direct defiance of the federal government's revocation constitutes an unlawfully withheld agency action under SAPA.

127.    New York courts have long held that state agencies must adhere to clear legal directives and may not take actions that contradict higher legal authority.  See Boreali v. Axelrod, 71 N.Y.2d 1 (1987) (holding that agencies may not legislate beyond their authority or act without statutory backing).

128.    Because the MTA and TBTA continue to enforce congestion pricing despite lacking legal justification, their actions must be declared unlawful and set aside under SAPA.

## COUNT 3

**THE MTA AND NYSDOT'S CONDUCT CONSTITUTES AN UNLAWFUL DEPRIVATION OF RIGHTS UNDER 42 U.S.C. § 1983**

129.     Plaintiff Assemblyman Jake Blumencranz realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

130.     Under 42 U.S.C. § 1983, any individual who, under color of state law, deprives another of rights secured by the Constitution or laws of the United States is liable to the injured party.

131.     To establish a § 1983 claim, a plaintiff must demonstrate (1) a violation of a federally protected right and (2) that the deprivation was committed by a state actor. Here, both elements are satisfied.

132.     The MTA and NYSDOT's continued imposition of congestion pricing tolls constitutes a deprivation of federally protected rights because it contravenes the statutory protections of 23 U.S.C. § 301 and violates the Supremacy Clause.

133.     Plaintiff Assemblyman Jake Blumencranz and all affected drivers have a federally guaranteed right to use highways free from unauthorized state-imposed tolls.

134.     The Supreme Court has recognized that § 1983 applies when state entities act in direct defiance of federal law.   See Maine v. Thiboutot, 448 U.S. 1, 4-5 (1980) (holding that § 1983 provides a remedy for violations of federal statutes).

135.     Furthermore, the continued collection of congestion pricing fees after the revocation of federal authorization constitutes an unconstitutional taking of money without due process of law, violating the Fourteenth Amendment.

136.     The Supreme Court has made clear that state-imposed financial exactions must
have a valid legal basis.  See Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595,
612 (2013) (holding that unconstitutional conditions doctrine applies to state-imposed
fees).

137.     Here, the absence of federal approval renders the tolls unauthorized, making their
collection a constitutional violation.

## COUNT 4

### DECLARATORY AND INJUNCTIVE RELIEF ARE NECESSARY UNDER 28 U.S.C. §§ 2201, 2202

138.     Plaintiff Assemblyman Jake Blumencranz realleges and incorporates by reference
all preceding paragraphs as if set forth fully herein.

139.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the plaintiff seeks a
declaration that the congestion pricing program is unconstitutional and unenforceable.

140.     A declaratory judgment is appropriate where there exists an actual controversy
requiring judicial determination, and courts routinely issue such relief when state actions
contravene federal law.  See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127
(2007).

141.     In addition, a permanent injunction is warranted under 28 U.S.C. § 2202 to
prohibit further enforcement of the unlawful congestion pricing program.

142.     Injunctive relief is appropriate when a plaintiff demonstrates ongoing irreparable
harm and a clear violation of federal law.  See Winter v. Nat. Res. Def. Council, Inc., 555
U.S. 7, 20 (2008).

143.     Here, absent an injunction, affected drivers are, and will continue to be unlawfully charged.   The balance of equities strongly favors injunctive relief, as no legitimate governmental interest exists in enforcing an unauthorized toll.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

i.     Declare that Defendants' continued enforcement of the congestion pricing toll, despite the revocation of federal approval, is in direct conflict with 23 U.S.C. § 301, in excess of statutory authority, and ultra vires; in violation of Plaintiff Assemblyman Jake Blumencranz's and all affected drivers' rights under the Supremacy Clause of the United States Constitution; without observance of procedure required by law in violation of the Administrative Procedure Act (APA); arbitrary and capricious in violation of the APA; and constitutes an unlawful deprivation of property without due process in violation of the Fifth and Fourteenth Amendments;

ii.     Vacate Defendants' decision to continue enforcing the congestion pricing toll and order Defendants to immediately cease all toll collection associated with the congestion pricing program;

iii.     Issue a permanent injunction prohibiting Defendants from collecting congestion pricing tolls unless and until explicit federal approval is reissued and ensuring that Defendants' actions comply with the requirements of federal law;

iv.     Order Defendants to refund all congestion pricing tolls unlawfully collected since the revocation of federal authorization;

v.      Issue an order compelling Defendants to comply with federal law and terminate the congestion pricing tolls as stipulated by Sean P. Duffy, Secretary of the United States Department of Transportation;

vi.     Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

vii.    Award Plaintiff Assemblyman Jake Blumencranz his costs for the action; and

viii.   Grant all such other and further relief as the Court deems just and proper.

Dated: New York, New York
March 3, 2025

By:

Stefano Pérez, Esq.
*Attorney for Plaintiff Assemblyman Jake Blumencranz*
New York State Assembly
LOB 722
Albany, NY 12248
(518) 455-4685
perezs@nyassembly.gov